In the Matter of the Estate of THEODORE J. YUND, Deceased.

Surrogate's Court, Montgomery County, September 21, 1934.

*James W. Ferguson* [*Lawrence B. McKelvey* of counsel] for the executors.

*Murphy, Aldrich, Guy & Broderick* [*Charles B. Aldrich* of counsel], for Albert H. Yund and others.

*Chandler S. Knight* [*Harry V. Borst* of counsel], for the objectors.

*Daisy S. Borst*, special guardian for infants.

AULISI, S. Theodore J. Yund, a resident of the city of Amsterdam, N. Y., died on July 19, 1932, leaving a last will and testament dated January 19, 1932, and admitted to probate in this court on July 30, 1932. The testator left his widow, Clara C. Yund, and a brother, Albert H. Yund. His estate was appraised at about $300,000. Upon this accounting proceeding, objections have been filed by the widow and the trustees representing her.

There are three objections to consider here. The first relates to the failure by the executors to account for certain income. The second relates to the sale of certain bank stock and the third to the payment of certain notes. I shall consider the objections in that order.

The executors testified that no interest was paid to them upon the sale of the German and steel work bonds, for the reason that they were sold " flat " because of the conditions then existing in the market. The proof shows that the dividend upon the telephone stock was not received by the executors until after the account in this proceeding was filed. I have no doubt that it will be included in a subsequent account filed on the final accounting. In the absence of any evidence being offered by the objectors to contradict the proof of the executors, I must conclude that the first objection cannot be sustained.

The testator was the owner of fifty-six shares of the Montgomery County Trust Company stock, and shortly after his death it was appraised upon the inventory of the personal property at $400 a share. Such stock was not listed on any stock exchange. Nearly eighteen months thereafter said bank stock was sold by the executors at $300 a share, a loss of $100 a share from the inventory value, and the widow objects to the executors crediting themselves with the loss. Considerable evidence was taken regarding this objection and I fail to see what good it will do to review it all in detail. The proof, however, clearly shows that at no time since testator's death was there any market for this stock, that there were several hundred shares being offered by other stockholders at $300 and no purchaser could be found except that there was one or two sales of stock owned by other parties which brought $400 a share but were made under special circumstances and cash was not paid for same; that the price realized for the stock sold by the executors was upon a cash sale and was its fair market value and that it was sold with the consent of one of the objectors. There is no proof here that a single person would have paid $400 or more than $300 for said stock, nor is there any proof of any fraud or willful wrongdoing on the part of the executors in connection with such sale.

The measure of duty imposed upon the representative of an estate is not the highest degree of technical skill or care, nor the

last word in perfection. The true rule which should govern his conduct is, that he is bound to employ such prudence and such diligence in the care and management of the estate or property as, in general, prudent men of discretion and intelligence employ in their own like affairs. (*King* v. *Talbot*, 40 N. Y. 76; *McCabe* v. *Fowler*, 84 id. 314.)

Stocks fluctuate in value and bank stock particularly has not been in great demand since the bank holiday of March, 1933. It is my opinion that in the disposition of the bank stock the executors not only exercised fair discretion but also ordinary prudence.

The third objection concerns the payment by the executors to the Amsterdam City National Bank of the sum of $27,274.10 on a series of six notes, made by Albert H. Yund and indorsed for his accommodation by the decedent. This objection requires the court to construe the will.

The third paragraph of the will reads as follows: " It is my intention during my lifetime to release and discharge my brother Albert H. Yund from any and all obligations and indebtedness which may be due and owing me by my said brother. If, however, I should hold at the time of my death any obligations or indebtedness against my said brother Albert H. Yund which I have not released and discharged in my lifetime, then and in that event, it is my will that said obligations and indebtedness shall be discharged and my said brother released from any obligation to pay the same. This is intended to include any obligation which he may owe me or my estate due to the payment of any of his notes which I have endorsed for him and which I or my estate may have to pay because of said endorsements."

The executors justify the payment of said notes on the ground that the will provided for and directed such payment, that the circumstances surrounding the testator at the time the will was made clearly leads to the conclusion that such was his intent, that they were required by law to make such payment and any effort at recourse from the maker of the notes would have been futile and a waste of the funds of the estate.

The objectors contend that paragraph third of the will makes a gift of the notes only in the event that Albert H. Yund is unable to pay them and has no property out of which the executors could recover a part or all of the amounts paid by them to the bank.

Upon the trial of the objections, evidence was introduced by which it was sought to show the intent of the testator. The objectors contend that this evidence should not be considered and counsel has submitted a very able brief which I have carefully examined. I believe, however, that in deciding these questions

adjudicated cases are of little assistance. Each will is a law unto itself. In making construction of a will there have been laid down many rules, but we must bear in mind that the cardinal canon of construction of the will is the intent of the testator as gathered from the four corners of the will. The rules are subordinate to the will and not destructive of it.

" It is the testator's mind we seek to read. * * * To interpret this intent we may consider the circumstances known to him when the will was made, and we may search the will itself for any language that may give us light." (*Matter of Neil*, 238 N. Y. 138, 140.) Judge CRANE said in *Matter of Watson* (262 N. Y. 284, 297): " The language of each will leads to its own conclusion. No two persons are alike; neither are their wills. Every one has his own peculiar family history, temperament, duties and responsibilities. No two estates are alike. How, then, can we expect one will to be a pattern for another? This is one field where standardization has proved ineffectual. We still take each document on its own merits. Either for good or ill, a testament has no progeny. Each is a new creation."

A well-established and reasonable rule of construction requires that in arriving at the intent of the testator, which is always the object to be sought and given effect to (*Matter of Buechner*, 226 N. Y. 440; *Cammann* v. *Bailey*, 210 id. 19; *Phillips* v. *Davies*, 92 id. 199), no isolated words or phrases are to be considered, but the whole will must be looked into, and if possible, all of its parts harmonized and given effect. (*Matter of Title Guarantee & Trust Company*, 195 N. Y. 339; *Howland* v. *Clendenin*, 134 id. 305; *Roe* v. *Vingut*, 117 id. 204; cases cited in *Matter of Columbia Trust Company*, 97 Misc. 566, 571.)

It is the modern rule that " with the exception of direct statements of intention, no extrinsic fact, relevant to any legitimate question arising in the interpretation of writings and admissible under the general rules of evidence," can be shut out. (Thayer's Preliminary Treatise on Evidence, 445; 5 Wigm. Ev. [2d ed.] § 2470; *Matter of Neil*, 238 N. Y. 138; *Dobbins* v. *Pratt Chuck Company*, 242 id. 106.) Sometimes the rule has been stated with the proviso that extrinsic facts may be shown in cases only " where the language alone is of doubtful import." (*Morris* v. *Sickly*, 133 N. Y. 456.) We take this to mean merely that the probable intention of the writer, as indicated by extrinsic facts, may not prevail over the plain meaning of the written word, nor have any force whatever, unless the words incorporated in the writing are susceptible of a meaning which expresses the intent thus disclosed. It has been said by Professor Wigmore: " The truth had finally to

be recognized that words always need interpretation; that the process of interpretation inherently and invariably means the ascertainment of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document." (5 Wigm. Ev. [2d ed.] § 2470, subd. 3.) The process of interpreting a legal document has been defined as follows: " To interpret a legal writing is, therefore, first to collect the intent, to discover the writer's meaning; secondly, to ascertain that that meaning is expressed sufficiently." (F. Vaughan Hawkins on the Principles of Legal Interpretation, see Appendix C to Thayer's Treatise, p. 581; *Matter of Smith*, 254 N. Y. 283.)

An examination of every will usually, if not invariably, discloses a testamentary scheme or a dominant or cardinal purpose. It is always the effort of the court to give force and effect to this scheme or primary purpose, and a construction will not be adopted which is hostile thereto or would bring about its defeat. The general scheme or dominant purpose will be carried out, regardless of inaccuracies of expression, an inapt arrangement of clauses, or uncertainty, obscurity or ambiguity of language. The general or dominant purpose must prevail, although it may be necessary to depart from the literal meaning or sense of the language, or the strict grammatical construction thereof. Ascertained, the intention " overrides the inadequacy or incorrectness of the language or the punctuation."

If the above rules are applied to the case at bar, I believe the testator's intent will be evident. In the first paragraph of his will the testator gives his wife their home and furnishings. In the second he sets up a trust fund of $50,000 which is to be held by a trust company " *for the use and benefit of my brother*, Albert H. Yund." By the third paragraph he releases and discharges his said brother " *from any and all obligations and indebtedness which may be due and owing me by my said brother*." Then he provides that, if he should fail to release all indebtedness, in such event " *it is my will that said obligations and indebtedness shall be discharged and my said brother released from any obligation to pay the same*." Finally he closes the third paragraph in this language, " *this is intended to include any obligation which he may owe me or my estate due to the payment of any of his notes which I have endorsed for him and which I or my estate may have to pay because of said endorsements*."

The testimony is undisputed that the testator was a man successful in business and financial affairs and that his brother, Albert H. Yund, was not. At the time of testator's death his brother was liquidating his furniture business from which he received but a

few hundred dollars. He was the owner of a home which was heavily mortgaged and upon which taxes, interest and insurance were unpaid. This constituted Albert H. Yund's entire assets. The testator had been the indorser on said notes for several years. These notes increased in amount from year to year and on several occasions the testator paid the interest thereon. They were the only notes in existence on the date of the will or at any time thereafter to the date of death which Albert H. Yund had made and which were indorsed by his brother. The decedent knew the financial condition of his brother and he well knew that the maker of the notes would never be able to pay them. Their relations were pleasant and congenial up to the hour of his death. His brother Albert was his nearest relative. It seems to me that all the facts and circumstances disclosed on the hearings clearly indicate that Albert was the special object of his bounty.

By the second paragraph of the will the testator provided for a trust fund for his brother clearly with the intent to save the latter from want in the closing years of his life. The trust fund so created would prove to be of no benefit to Albert H. Yund if he were expected to pay said notes. I cannot, therefore, believe that testator intended that his brother should be required to pay the notes. Every natural human impulse would be to make the provisions he did.

As each of said notes became due they were protested for non-payment and when sufficient funds came into their hands, the executors paid the amounts after first notifying the widow by letter. She made no protest whatever and on the contrary she consented to the sale of certain bonds which she knew were to be sold for the payment of · the notes.

Notes, whether accommodation or otherwise, are within the terms " obligation " and " indebtedness;" for there is always an obligation on the part of the maker of a note to protect the indorser thereon, to reimburse the indorser if the indorser is required to pay. Promissory notes existing at the time of death are surely notes which the estate " may have to pay " in the event the maker does not pay.

From a careful examination of the entire will and giving all the evidence due weight, I am inclined to believe that the testator's intention was that the executors should pay said notes and I construe the will accordingly.

I, therefore, dismiss and overrule each and all the objections to the intermediate account of the executors and allow the account as filed.

A decree may be entered accordingly on notice.